**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| JAMES L. TOPPER, Derivatively on Behalf of Nominal Defendant NEOGEN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN ADENT, DAVID NAEMURA, JAMES C. BOREL, THIERRY BERNARD, WILLIAM T. BOEHM, JEFFREY D. CAPELLO, RONALD D. GREEN, AASHIMA GUPTA, RAPHAEL A. RODRIGUEZ, JAMES P. TOBIN, DARCI L. VETTER, and CATHERINE WOTEKI,<br><br>Defendants,<br><br>and<br><br>NEOGEN CORPORATION,<br><br>Nominal Defendant. | Case No. ______________<br><br>JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff James L. Topper ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Neogen Corporation ("Neogen" or the "Company" or "Nominal Defendant"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of their fiduciary duties, unjust enrichment, waste of corporate assets, and violations of federal securities law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which includes, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made

by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Neogen, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Operating Engineers Construction Industry and Miscellaneous Pension Fund v. Neogen Corporation, et al.*, Case No. 1:25-cv-00802-HYJ-RSK (W.D. Mich.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Neogen against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least January 5, 2023, and June 3, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Neogen is a Michigan corporation formed in June 1981 with operations beginning in 1982. Neogen and its subsidiaries develop, manufacture, and market a diverse line of products and services dedicated to food and animal safety. The Company operates through two segments: (1) the Food Safety segment and (2) the Animal Safety segment.

3. The Food Safety segment consists primarily of diagnostic test kits and complementary products (e.g., culture media) sold to food and animal feed producers and processors to preserve the safety and quality of food to prevent contamination and foodborne illnesses such as foodborne pathogens, spoilage organisms, natural toxins, food allergens, and

[1] The Individual Defendants are John Adent ("Adent"), David Naemura ("Naemura"), James C. Borel ("Borel"), Thierry Bernard ("Bernard"), William T. Boehm ("Boehm"), Jeffrey D. Capello ("Capello"), Ronald D. Green ("Green"), Aashima Gupta ("Gupta"), Raphael A. Rodriguez ("Rodriguez"), James P. Tobin ("Tobin"), Darci L. Vetter ("Vetter"), and Catherine Woteki ("Woteki"). "Defendants" means Neogen and the Individual Defendants.

ruminant by-products. Revenues from the Food Safety segment accounted for 71.3%, 70.9%, and 66.5% of the Company's total revenues for fiscal years 2025, 2024, and 2023, respectively.[2]

4. The Animal Safety segment is engaged in the development, manufacture, marketing and distribution of veterinary instruments, pharmaceuticals, vaccines, topicals, parasiticides, diagnostic products, rodent control products, cleaners, disinfectants, insect control products and genomics testing services for the worldwide animal safety market. Revenues from the Animal Safety segment accounted for 28.7%, 29.1%, and 33.5% of the Company's total revenues for fiscal years 2025, 2024, and 2023, respectively.

5. On December 14, 2021, Neogen announced that it was merging with the Food Safety Division ("FSD") of 3M Company ("3M"). The $5.3 billion transaction closed on September 1, 2022 (the "Merger"). Pursuant to the terms of the Meger, Neogen Food Safety Corporation (formerly known as Garden SpinCo), a subsidiary created to carve out 3M's FSD, became a wholly owned subsidiary of Neogen, thereby allowing the Company to integrate 3M's FSD. The Company touted the Merger in its press releases announcing the Merger and its closing, stating, in relevant part, that "[t]he combination of Neogen and 3M's Food Safety business creates a leading innovator with an enhanced geographic footprint, innovative product offerings, digitization capabilities, and financial flexibility to capitalize on robust growth trends in sustainability, food safety, and supply chain integrity."

6. Following the closing of the Merger, the Company embarked on a lengthy and complex integration process for the newly acquired FSD. Throughout the Relevant Period, the Company's officers and directors repeatedly misled investors by assuring the public that the integration of Neogen and FSD was progressing better than it actually was, and that certain

---

[2] Neogen's fiscal year ends on May 31st.

"inefficiencies" were being quickly resolved by the Company. However, in reality, there were significant systemic issues with the integration, which negatively impacted the Company's financial health.

7. The truth began to emerge on January 10, 2025, when the Company issued a press release announcing its preliminary financial results for the second quarter of fiscal year 2025 (the "Preliminary 2Q25 Press Release"). In the Preliminary 2Q25 Press Release, the Company revealed disappointing financial results, reporting that the Company experienced a net loss of $456.3 million for the third quarter, or $2.10 per share (compared to a net loss of $3.5 million, or $0.02 per share the same quarter the prior year), which was "driven by a non-cash goodwill impairment charge related primarily to the acquisition of the former 3M Food Safety Division."

8. In the 2Q25 Preliminary Press Release, the Company also announced that it was adjusting its fiscal year 2025 outlook, decreasing its revenue to be in the range of $905 million to $925 million and its Adjusted EBITDA to be in the range of $205 million to $215 million. Additionally, in the Preliminary 2Q25 Press Release, the Company admitted that "[a]s a result of management's assessment of the Company's internal control over financial reporting, the Company concluded that, as of November 30, 2024, the Company had deficiencies in the control activities and information . . . that constitute material weaknesses."

9. On this news, the price of Neogen stock declined by approximately 5%, from a price of $13.07 per share on January 8, 2025, to a price of $12.36 per share on January 10, 2025.

10. The truth continued to emerge on April 9, 2025, when the Company issued a press release announcing its financial results for the third quarter of fiscal year 2025 (the "3Q25 Press Release"). In the 3Q25 Press Release, the Company reported a loss of $11 million, or $0.05 per share (compared with a loss of $2 million, or $0.01 per share, the same quarter in 2024). In the

3Q25 Press Release, the Company also reported that its revenue fell 3.4% to $221 million and that it was again cutting its revenue outlook for fiscal year 2025 to approximately $895 million. The Company also noted in the 3Q25 Press Release that capital expenditures were expected to be $100 million because of lowered adjusted EBITDA and a "pull-forward of integration capex into fiscal 2025." Moreover, in a second press release issued by the Company on the same day, Neogen announced that Defendant Adent was stepping down as Chief Executive Officer ("CEO") of the Company.

11. On this news, the price of Neogen's stock declined by approximately 28%, from a price of $7.04 per share on April 8, 2025, to a price of $5.02 per share on April 9, 2025.

12. The truth was fully revealed on June 4, 2025, when the Company published presentation materials for the William Blair Growth Stock Conference, which, in Neogen's update for the fourth quarter of fiscal year 2025, revealed that the Company's "[a]djusted EBITDA margin anticipated to be in the high-teens range" which represented a considerable drop from the previous quarter's profit margin of 22%. Neogen blamed the expected shortfall on "elevated inventory write-offs."

13. On this news, the price of Neogen's stock declined by approximately 17% from a price of $6.00 per share on June 3, 2025, to a price of $4.96 per share on June 4, 2025.

14. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's integration of 3M's FSD into its business was riddled with inefficiencies from day one, the Company's executives and directors knew these integration issues would necessitate a goodwill impairment, and these

integration issues would impact the Company's financial health, including its capital expenditures, revenues, and EBITDA margins; (ii) due to the size of the Merger, the Company was experiencing issues integrating 3M's FSD into its business with respect to manufacturing, shipping, production overlap, and internal controls; (iii) there was no reasonable basis to believe that Neogen's capital expenditures would lessen significantly in 2025; (iv) the Company failed to maintain adequate internal controls over the integration and its public reporting, among other things; and (v) as a result of the foregoing, positive statements concerning the Company's business, financials, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

15. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Adent and Naemura in the United States District Court for the Western District of Michigan.

16. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") as the claims asserted herein arise under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

18. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21. In connection with the acts, conduct, and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Neogen is incorporated in this District and maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

### *Plaintiff*

23. Plaintiff is, and has been at all relevant times, a continuous shareholder of Neogen common stock.

### *Nominal Defendant*

24. Nominal Defendant Neogen is a Michigan corporation with its principal executive offices located at 620 Lesher Place, Lansing, Michigan 48912. Neogen's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "NEOG."

### *Individual Defendants*

25. Defendant Adent served as CEO and President of the Company from 2017 until

August 11, 2025, and as a director of the Company from 2018 until August 11, 2025. Defendant Adent is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Adent received the following in compensation from the Company during the Relevant Period:

| **Fiscal Year** | **Total Compensation** |
|---|---|
| 2023 | $5,325,174 |
| 2024 | $7,221,352 |
| 2025 | $6,824,891 |

26. Defendant Naemura served as Chief Financial Officer ("CFO") of the Company from November 2022 to September 15, 2025. Naemura also served as Chief Operating Officer ("COO") of the Company from January 1, 2025, to September 15, 2025. Defendant Naemura is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Naemura received the following in compensation from the Company during the Relevant Period:

| **Fiscal Year** | **Total Compensation** |
|---|---|
| 2023 | $1,979,143 |
| 2024 | $4,810,651 |
| 2025 | $2,680,181 |

27. Defendant Borel has served as a director and Chair of the Company's Board since 2016. Borel also serves as interim Chair of the Company's Governance Committee and as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Borel received the following in compensation from the Company during the Relevant Period:

| **Fiscal Year** | **Total Compensation** |
|---|---|
| 2023 | $262,500 |
| 2024 | $270,000 |
| 2025 | $292,500 |

28. Defendant Bernard has served as a director of the Company since November 2024.

Bernard also serves as a member of the Company's Compensation Committee and Governance Committee. According to the Company's public filings, Defendant Bernard received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2025 | $226,467 |

29. Defendant Boehm served as a director of the Company from May 2011 until October 23, 2025. Boehm also served as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee during the Relevant Period. According to the Company's public filings, Defendant Boehm received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $235,000 |
| 2024 | $247,500 |
| 2025 | $247,500 |

30. Defendant Capello has served as a director of the Company since September 2022. Capello also serves as a member of the Company's Compensation Committee and Audit Committee. According to the Company's public filings, Defendant Capello received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $201,250 |
| 2024 | $237,500 |
| 2025 | $237,500 |

31. Defendant Green has served as a director of the Company since October 2014. Green also serves as Chair of the Company's Science, Technology and Innovation Committee and as a member of the Company's Governance Committee. According to the Company's public filings, Defendant Green received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $231,250 |
| 2024 | $242,500 |
| 2025 | $242,500 |

32. Defendant Gupta has served as a director of the Company since September 2022. Gupta also serves as a member of the Company's Governance Committee and Science, Technology and Innovation Committee. According to the Company's public filings, Defendant Gupta received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $200,000 |
| 2024 | $235,000 |
| 2025 | $235,000 |

33. Defendant Rodriguez has served as a director of the Company from since October 2020. Rodriguez also serves as a member of the Company's Compensation Committee and Science, Technology and Innovation Committee. According to the Company's public filings, Defendant Rodriguez received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $225,000 |
| 2024 | $235,000 |
| 2025 | $235,000 |

34. Defendant Tobin served as a director of the Company from October 2016 to May 31, 2025. Tobin also served as Chair of the Company's Governance Committee and as a member of the Company's Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Tobin received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $232,500 |
| 2024 | $246,250 |

| | |
|---|---|
| 2025 | $245,000 |

35. Defendant Vetter served as a director of the Company from October 2017 until April 5, 2023. Vetter also served as Chair of the Company's Compensation Committee and as a member of the Company's Governance Committee during the Relevant Period. According to the Company's public filings, Defendant Vetter received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $231,250 |

36. Defendant Woteki has served as a director of the Company since October 2020. Woteki also serves as Chair of the Company's Compensation Committee and as a member of the Company's Science, Technology and Innovation Committee. According to the Company's public filings, Defendant Woteki received the following in compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $225,000 |
| 2024 | $238,750 |
| 2025 | $242,500 |

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37. By reason of their positions as officers and/or directors of Neogen, and because of their ability to control the business and corporate affairs of Neogen, the Individual Defendants owed Neogen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Neogen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Neogen and its shareholders.

38. Each director and officer of the Company owes to Neogen and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Neogen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. To discharge their duties, the officers and directors of Neogen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Neogen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially

misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43. To discharge their duties, the officers and directors of Neogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Neogen were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Michigan and the United States, and pursuant to Neogen's own Code of Business Conduct & Ethics (the "Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Neogen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Neogen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Neogen's operations would comply with all applicable laws and Neogen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44. Each of the Individual Defendants further owed to Neogen and the shareholders the duty of loyalty requiring that each favor Neogen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45. At all times relevant hereto, the Individual Defendants were the agents of each other and of Neogen and were at all times acting within the course and scope of such agency.

46. Because of their advisory, executive, managerial, and directorial positions with Neogen, each of the Individual Defendants had access to adverse, non-public information about the Company.

47. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Neogen.

## NEOGEN'S CODE OF BUSINESS CONDUCT & ETHICS

48. The Company's Code of Conduct states that it "applies to everyone at Neogen, from our Board of Directors to our executives, directors, and all of our employees." The Code of Conduct sets out that it is the responsibility of those whom the Code of Conduct applies to "understand our obligations under this [Code of Conduct], all Neogen policies, and the law. We have a duty to speak up, ask questions, and report any evidence of wrongdoing that we suspect or observe." The Code of Conduct also states that "[c]ompliance with this Code of Business Conduct & Ethics is mandatory."

49. Under a section titled "Fair Competition," Neogen's Code of Conduct states, in relevant part:

> We are committed to conducting business in a transparent, fair, and honest manner, in compliance with competition laws everywhere Neogen operates.
>
> We will not participate in:
> - Exchanges of confidential information, including pricing, sales volumes, customers, territories, business strategy, and marketing plans
> - Abuse of our position within the marketplace
> - Seeking confidential information regarding our competitors
> - Presenting misinformation regarding our products, services, or those of our competitors
> - Entering into any agreements or "understandings," whether horizontal or vertical, with the objective of limiting, impeding, restricting, or distorting our competition within the marketplace

50. Under a section titled "Accurate Public Disclosures," the Code of Conduct states, in relevant part:

> Presenting ourselves in an accurate and truthful manner to our stakeholders, customers, and the public is vital to our success.

> We make certain that all financial statements and public disclosures are made in a timely manner and are presented as full, fair, and accurate representation of the state of our business, financials, and products.
>
> We do not tolerate any purposeful misrepresentation of facts or falsifying records.

51. Under the section titled "Corporate Recordkeeping," the Code of Conduct states, in relevant part:

> It is vital to our stakeholders that we maintain accurate and complete business records. Our records must be produced in a timely manner, be transparent, and correct.
>
> The internal records we keep must be accurate in order to ensure that any public-facing documents derived from this information, including disclosure statements, annual reports, and press releases are also accurate. All records are maintained and kept in compliance with all applicable laws and regulations.
>
> It is our responsibility to report any unrecorded, misrepresented, absent, or falsified entries within Neogen's bookkeeping that may constitute fraud, embezzlement, theft, or misuse of our assets.

52. Under the section tilted "Conflicts of Interest," the Code of Conduct states, in relevant part:

> A conflict of interest can occur when you have an interest that could interfere with your ability to be objective in your actions or decision at Neogen. It is imperative that all members of our staff avoid any conflicts between their personal interests and those of Neogen.
>
> You are expected to proactively avoid situations that create, potentially create, or appear to create a conflict with the best interests of the company.
>
> Though it's not possible to list all situations that could present a conflict of interest, here are some examples:
> - Accepting gifts from any organization that does, or is seeking to do, business with Neogen or from any individual who is in a position to influence Neogen's business decisions
> - Holding a significant interest in a customer, competitor, or third party that works with Neogen
> - Being employed by or sitting on the board of any organization that does, or is seeking to do, business with, or that competes or could compete, with Neogen
> - Profiting personally through commissions, loans, expense reimbursements, or

other payments from an organization seeking to do business with Neogen

- Usurping a business opportunity of Neogen's or that you learned of from your relationship with Neogen
- Having family members who are involved in any of the above situations

53. Under the section titled "Speaking to the Media," the Code of Conduct states, in relevant part, "We need clear and consistent external messaging that is aligned with our values and corporate strategy. It is important that only authorized individuals speak publicly on Neogen's behalf."

## NEOGEN'S AUDIT COMMITTEE CHARTER

54. Neogen's Audit Committee Charter states that the purpose of the Audit Committee is to:

> The purpose of the Audit Committee (the Committee) is to assist the Board of Directors (the Board) of Neogen Corporation (the Company) in overseeing: (1) the integrity of the Company's financial statements, including its use and reporting of any non-GAAP measures, (2) the effectiveness of the Company's internal control over financial reporting, (3) the Company's compliance with laws and regulations to which it is subject, (4) the Independent Auditor's qualifications, independence and performance, and (5) the performance of the Company's Internal Auditors.
>
> The Committee's role includes a particular focus on the qualitative aspects of financial reporting to shareholders and on Company processes for the management of financial risk and for compliance with significant applicable legal, ethical and regulatory requirements. The role also includes coordination with other board committees and maintenance of strong, positive working relationships with management, Independent and Internal auditors, Legal Counsel and other Committee advisors.

55. In a section titled "Committee Authority and Responsibilities," the Audit Committee Charter states that the Audit Committee has the following responsibilities, among others:

> The Committee shall appoint, retain, evaluate and, if necessary and appropriate, terminate the Company's Independent Auditor. All such actions will be subject to ratification by the Board of Directors and the Company's shareholders at the annual meeting. The Committee shall also determine and approve compensation of the Independent Auditor. Such action will be presented to the Board for ratification.

Independent Auditor compensation shall be provided by Management along with appropriate administrative support. The Independent Auditor shall report functionally to the Committee, but administratively to management.

The Committee shall approve the Company's engagement terms with the Independent Auditor, and shall pre-approve all non-audit activities and any audit-related activities that go beyond the originally anticipated scope. It shall also seek to resolve any financial reporting disagreements that may emerge between the Independent Auditor and Management . . . .

The Committee shall, at least annually, review with management, Board policies specifically related to the financial management of the Company including currency hedging, debt financing, insurance and cash management. The Committee will also, at least annually, review with Management any required regulatory filings (such as Conflict Minerals), legal proceedings and other potential or alleged violations that may, or are likely to, adversely impact financial results. In conjunction with the Governance Committee, the Committee shall annually review the Company's risk assessment and risk management policies and procedures.

The Committee shall also annually prepare the "Audit Committee Report" which must be included in the Company's annual proxy statement.

It is not the Committee's responsibility to prepare or certify the Company's financial statements, guarantee the accuracy or relevance of reports by the Independent Auditor, or guarantee Company disclosures. It is the responsibility of the Independent Auditor to provide an opinion, based on its audits, whether the Company's financial statements fairly present, in all material respects, the consolidated financial position of Neogen Corporation and its subsidiaries, and that the consolidated results of their operations and cash flows are in conformity with accounting principles generally accepted in the United States of America. It is also the responsibility of the Independent Auditor to provide an opinion, based on its audits, whether the Company's internal controls over financial reporting are effective.

It is not the duty of the Committee to plan or conduct audits, or to determine that the Company's financial statements and disclosures are complete, accurate, and in conformity with Generally Accepted Accounting Principles. Nor is it the duty of the Committee to guarantee the Company's compliance with the laws and regulations to which it is subject, nor with the Company's own Code of Conduct. However, the Committee will, with the Governance Committee, regularly, but at least annually, review the adequacy of the Company's programs for compliance with company policies, the law and applicable regulatory requirements. And it shall satisfy itself that the company's published reports concerning its performance against environmental goals such as greenhouse gas emissions, and carbon footprint are credible.

> The preparation, certification, and submission of the Company's financial statements is a fundamental responsibility of Management. Management is also responsible for establishing and maintaining adequate internal control over financial reporting. The Independent Auditor's responsibility is to express an opinion on those financial statements and the effectiveness of the Company's internal control over financial reporting based on its audits. The Committee's role is one of oversight; it is not the role of an auditor.
>
> Without additional Board approval the Committee may engage external legal, accounting, or other advisors deemed necessary to the fulfillment of its duties under the Charter. Upon approval of the Committee the Company shall provide appropriate financial support for such engagements. The Committee shall annually review its own performance, reporting the results of that review to the Chairman of the Governance Committee. It shall also review its scope, policies and procedures, with that review to encompass an assessment and update of this Charter. Any recommended changes to this Charter shall be presented to the Governance Committee, for ultimate approval by the Board.

56. Under the section titled "Oversight of the Independent Auditor," the Audit Committee Charter states, in relevant part:

> The Committee shall annually discuss with the Independent Auditor and Management the scope of the proposed audit for the ensuing fiscal year and, when satisfied, approve the scope and the proposed schedule for meeting its requirements.
>
> The Committee shall take whatever actions it deems appropriate in establishing an effective working relationship with the Independent Auditor, and shall do the same with Management and particularly with the Chief Financial Officer and his or her financial team.
>
> The Independent Auditor shall at least annually provide for the Committee a report describing: (1) the firm's quality control procedures for financial reporting; (2) any material issues raised by its most recent peer review; and (3) any material issues raised by the PCAOB, the SEC, or any other regulator that might be of interest to or concern of the Committee.
>
> The Committee shall regularly review and evaluate the qualifications, independence, and performance of the Independent Auditor, and particularly of its Lead Audit Partner. It shall report its conclusions to the full Board at least annually.
>
> The Committee shall insure that the Lead Audit Partner is rotated regularly as required by Section A(j) of the Exchange Act. The Committee shall also establish hiring policies for employees and former employees of the Independent Auditor that are consistent with the applicable provisions of the Exchange Act.

57. Under the section titled "Oversight of Internal Auditors," the Audit Committee Charter states, in relevant part:

> Internal Auditors shall report functionally to the Audit Committee but administratively to Management. It is Management's responsibility to hire Internal Auditors. However, the compensation package for Internal Auditors shall be reviewed and approved on an annual basis by the Audit Committee. Management shall perform an annual performance review of the Internal Auditors work, and shall report on the review to the Committee.
>
> Management and the Independent Auditor shall discuss with the Committee the Internal Auditors' responsibilities, and the financial and other administrative support that will be necessary in carrying out those responsibilities. One of the Committee's oversight responsibilities will be to ensure that the Internal Auditors' work will be supplementary and complementary to the work of the Independent Auditor.
>
> The Committee shall review, amend if necessary, and ultimately approve an annual work plan for the Internal Auditors, after having coordinated with and considered the views of Management and the Independent Auditor. Should the scope of the annual work plan call for additional staffing, that need shall be met by Management, but only after Management has had full opportunity to present its view as to how the increased staffing may be most efficiently provided.
>
> the Independent Auditor should that be appropriate) any significant difficulties or disagreements encountered with Management or the Independent Auditor during the course of any of the Internal Auditors' activities. This review shall include any restrictions sought to be imposed by Management on the Internal Auditors' scope of work, and any restriction of access to necessary information.

58. Under the section titled "Disclosure and Financial Statements," the Audit Committee Charter states, in relevant part:

> The Committee shall review and discuss with Management and the Independent Auditor annual financial statements that have been prepared by Management and duly audited by the Independent Auditor. When satisfied that those documents meet all relevant regulatory requirements, while also presenting the Company's financial status and performance to stakeholders in a comprehensible way, the Committee shall recommend Board approval of the audited financial reports, their inclusion in the Company's annual report on Form 10-K, and their submission to the appropriate regulatory entities. The Committee shall follow essentially the same procedure with respect to quarterly financial reports, which shall be filed on Form 10-Q. The Committee will inform the Board of its approval of the filing of the Form 10-Q.

> The Committee shall review and discuss with Management and the Independent Auditor: (1) major issues regarding accounting principles and financial statement presentations, including significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by Management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with preparation of the Company's financial statements including management's use, if any, of non-GAAP measures when reporting results; and (3) the effect of new or revised regulatory initiatives on the Company's financial statements. On a quarterly basis, the Committee shall discuss with Management and the Independent Auditor the financial data that should be included in the Company's financial reporting press releases and the way in which that data is presented, the objective being to communicate accurately and substantively with the Company's stakeholders. The Committee shall annually prepare and approve its report to be published in connection with the Company's proxy.
>
> The Committee shall have access to reports from the Independent Auditor regarding: (1) critical accounting policies and practices to be mandatorily or voluntarily applied by the Company in preparation of its financial documents; (2) alternative treatments of financial information – within generally accepted accounting principles – that have been discussed by the Independent Auditor with Management, ramifications of the use of these alternative disclosures and treatments, the treatment preference of the Independent Auditor and reasons for favoring that treatment; and (3) other material written communications between the Independent Auditors and Management – such as management letters or schedules of unadjusted differences – that are likely to be of interest to or concern of the Committee. PCAOB Auditing Standard No 16, "Communication with Audit Committees" issues shall be discussed by the Committee with the Independent Auditor, and results of those discussions shall then be appropriately disclosed. This discussion shall encompass any difficulties incurred by the Independent Auditor in carrying out its work, any restrictions on the scope of its activities or on access to requested information, and any significant disagreements with Management during the reporting period.
>
> The Committee shall also review the CEO and CFO's disclosure certifications, as well as certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.

59. Under the section titled "Compliance and Regulatory Oversight," the Audit Committee Charter states, in relevant part:

> Management shall report and the Committee shall review and approve, at least annually, all related party transactions and significant conflicts of interest.
>
> It is Management's responsibility to develop and administer the Company's "whistle blower" program. However, the Committee, shall monitor management's

> response to any complaints or concerns that are related to accounting functions, internal controls, audit matters, and any other confidential submissions that, if confirmed, would likely have an adverse and material impact on financial results and/or investor confidence. The General Counsel shall, at least quarterly, report to the Committee any activity addressed by management as a result of such submissions, however received. A record of such complaints and their disposition, including any involvement by the Committee, shall be retained by Management for such periods as the Committee requests.
>
> The Committee shall provide oversight of the Company's system of internal controls for detecting accounting and financial reporting errors, fraud, legal violations, and noncompliance with the corporate code of conduct. The Committee shall also review and discuss any such findings and any recommendations made by the Independent Auditor and/or the Internal Auditors, together with Management's responses. Management shall provide to the Committee any correspondence with regulators that would be of interest or concern to the Committee, along with any published reports that raise material issues regarding the Company's accounting policies.

## SUBSTANTIVE ALLEGATIONS

### *Background*

60. Neogen and its subsidiaries develop, manufacture and market a diverse line of products and services dedicated to food and animal safety. Neogen's Food Safety segment consists primarily of diagnostic test kits and complementary products (e.g., culture media) sold to food and animal feed producers and processors to preserve the safety and quality of food to prevent contamination and foodborne illnesses such as foodborne pathogens, spoilage organisms, natural toxins, food allergens, and ruminant by-products. These products also ensure the general hygiene of the food manufacturing environment. Neogen also has products to determine food quality and nutritional components. Most of the test kits are consumables, single-use, culture, immunoassay, and nucleic acid detection products that rely on proprietary antibodies and RNA and DNA testing methodologies to produce rapid and accurate test results. Neogen's line of food safety services also include advanced software systems that help testers objectively analyze, store and identify emerging issues from their results from multiple locations over extended periods. Revenues from

the Food Safety segment accounted for 71.3%, 70.9%, and 66.5% of the Company's total revenues for fiscal years 2025, 2024, and 2023, respectively.

61. Neogen's Animal Safety segment is engaged in the development, manufacture, marketing and distribution of veterinary instruments, pharmaceuticals, vaccines, topicals, parasiticides, diagnostic products, rodent control products, cleaners, disinfectants, insect control products and genomics testing services for the worldwide animal safety market. Most of these consumable products are marketed through veterinarians, retailers, livestock producers and animal health product distributors. Neogen's line of drug detection products are sold worldwide for the detection of abused and therapeutic drugs in animals and animal products and has expanded into the workplace testing and human forensic markets. Revenues from the Animal Safety segment accounted for 28.7%, 29.1%, and 33.5% of the Company's total revenues for fiscal years 2025, 2024, and 2023, respectively.

62. On December 14, 2021, Neogen announced that it was merging with the FSD of 3M. The $5.3 billion transaction closed on September 1, 2022. Pursuant to the terms of the Meger, Neogen Food Safety Corporation (formerly known as Garden SpinCo), a subsidiary created to carve out 3M's FSD, became a wholly owned subsidiary of Neogen, thereby allowing the Company to integrate FSD. The Company touted the Merger in its press releases announcing the Merger and its closing, stating, in relevant part, that "[t]he combination of Neogen and 3M's Food Safety business creates a leading innovator with an enhanced geographic footprint, innovative product offerings, digitization capabilities, and financial flexibility to capitalize on robust growth trends in sustainability, food safety, and supply chain integrity."

63. Following the closing of the Merger, the Company embarked on a lengthy and complex integration process for the newly acquired FSD. Throughout the Relevant Period, the

Individual Defendants repeatedly misled investors by assuring the public that the integration of Neogen and FSD was progressing better than it was, and that the Company was quickly resolving certain "inefficiencies" with the integration of FSD. However, in reality, there were significant systemic issues with Neogen's integration of FSD which was negatively impacting the Company's financial health.

***Materially False and Misleading Statements***

<u>January 5, 2023 Statements</u>

64. On January 5, 2023, the Company issued a press release (the "2Q23 Press Release") announcing its financial results for the second quarter of fiscal year 2023, which was the first full quarter since the closing of the Merger. In the 2Q23 Press Release, the Company highlighted its positive financial results and Defendant Adent, the then-President and CEO of the Company, was quoted as stating, in relevant part:

> We are pleased to report our first quarter of results including the former Food Safety Division of 3M[.] This was a transformational merger with a high-quality business, firmly placing Neogen in a leadership position in the attractive, consumables-driven food safety market and fundamentally enhancing our financial profile. ***We've brought a reenergized focus to the Food Safety Division, which performed well in the quarter, and integration activities are fully underway, with the commercial organizations already combined and actively targeting prioritized synergy opportunities***[.][3]
>
> We delivered solid growth and margin expansion, and I am proud of the hard work of our more than 2,500 team members around the world who delivered this performance. ***I'm pleased with the integration progress made to date and confident our growing team has the requisite skills, expertise, and commitment to successfully combine the businesses into One Neogen***. We are excited about the favorable long-term trends in food safety and the opportunities they provide, and believe our company is well positioned to capitalize on them.

65. On the same day, the Company hosted an earnings call for investors and analysts

[3] Emphasis is added unless otherwise noted.

to discuss its financial results for the second quarter of fiscal year 2023 (the "2Q23 Earnings Call"). During the 2Q23 Earnings Call, Defendant Adent touted the Merger, stating, in relevant part:

> We're pleased to be with you today to provide the first view of the company's performance since the completion of the Food Safety acquisition from 3M. ***We've delivered solid core growth in both of our segments and, notably, a level of profitability well ahead of where the company was prior to the acquisition. The former 3M Food Safety business is a great business and highly complementary and we're excited about what we've seen in the first four months of our ownership.***
>
> Clearly, we have still got a number of things to do, and we're early days in the integration, but ***we're off to a great start and we have numerous work streams fully underway across the organization to integrate our systems, products, processes and people***. . . .
>
> Neogen is a resilient business, having grown now in 122 of the last 128 quarters, due largely to the consumable nature of our products, which play critical roles throughout the food supply chain. ***After the acquisition of the Food Safety division of 3M, approximately 95% of our total revenues come from consumable products, which we believe positions us to continue to grow despite the current level of macro uncertainty.***

<u>March 30, 2023 Statements</u>

66. On March 30, 2023, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2023 (the "3Q23 Press Release"). In the 3Q23 Press Release, Defendant Adent was quoted as stating, in relevant part:

> The performance of the former 3M Food Safety Division was mixed, with market demand offset by the production backlog situation at our transition manufacturing partner, ***where we believe significant engagement from senior levels of their organization and a modified reporting structure provide a path to successful resolution***. Despite navigating what we expect to be a ***transitory issue***, market reception to the merger has been positive and we are focused on positioning the combined business for long-term success. . . .
>
> There is clearly work that remains ahead of us, but ***I'm proud of the progress we've made and the efforts of our team members globally as we integrate a high-quality business*** and lay the groundwork for One Neogen moving forward.

67. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of fiscal year 2023 (the "3Q23 Earnings Call").

During the 3Q23 Earnings Call, Defendant Adent assured investors of Neogen's integration progress, stating, in relevant part:

> ***[W]e continue to make good progress on the integration activities***. Commercially, our teams have been combined and cross trained and we are navigating the tighter market conditions focused on a prioritized set of opportunities globally. ***We've seen significant growth in the sales pipeline over the last few months and are excited about the potential ahead.***

68. On the same call, Defendant Naemura highlighted the Company's financial performance, stating, in relevant part, that Neogen's "[a]djust[ed] EBITDA was $51 million representing growth of 106% from the prior year quarter driven by the merger with the former 3M Food Safety business."

<u>July 27, 2023 Statements</u>

69. On July 27, 2023, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year of 2023 (the "4Q23 Press Release"). In the 4Q23 Press Release, Defendant Adent was quoted stating, in relevant part:

> ***We continued to scale our capabilities during the fourth quarter to support the full integration of the former 3M Food Safety Division, which is proceeding according to plan. By the end of the fiscal third quarter, we expect to have three of four main product lines integrated into Neogen facilities, as well as back-office and distribution functions***, and will be focused on driving efficiencies in these operations. In addition to the important integration workstreams underway, we have continued to focus on growth and profitability initiatives in our pre-existing business. We introduced a number of new products in the quarter and will continue to prioritize innovation, leveraging the skills and expertise of our expanded product development team.

70. On the same day, the Company hosted an earnings call for investors and analysts (the "4Q23 Earnings Calls"). During the 4Q23 Earnings Call, Defendant Adent commented positively on the integration of 3M into Neogen stating, in relevant part, that "[i]n addition to the transition management agreement, ***integration activities are progressing well***. Of the four main product lines in the former 3M business, ***we expect that three will be completely integrated into***

***Neogen facilities by the end of our fiscal third quarter*.**"

71. During the 4Q23 Earnings Call, Defendant Naemura also touted the Company's financial performance, stating, in relevant part, that "[a]djusted EBITDA was $63 million, representing growth of 97% from the prior year quarter, driven by the merger with the former 3M Food Safety division."

72. Moreover, during the 4Q23 Earnings Call, Defendant Adent made the following closing remarks on the anticipated completion of the integration of FSD into Neogen, stating, in relevant part:

> Beyond the end markets, I'm very pleased with the progress we've made on the integration while maintaining focus on growing our business. Fiscal 2024 will be an exciting year for Neogen. ***By the end of this fiscal year, we expect to have all former 3M product lines, excluding Petrifilm, fully integrated into Neogen facilities***, where we'll be focused on driving efficiencies in production.

<u>September 18, 2023 Statements</u>

73. On September 18, 2023, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2023 Proxy"). In the 2023 Proxy, under the "Compensation Discussion and Analysis" section, the Company highlighted its progress in integrating FSD into Neogen, and how such progress led to certain officers realizing bonus opportunities. For example, the 2023 Proxy states, in relevant part, that:

> Overall, all target and actual bonuses are based on individual objectives and the Company's performance, within the discretion of the Compensation Committee. The Compensation Committee's assessment of the Company's overall performance was influenced, in part, by the following:
>
> - The 3M Food Safety transaction closed on September 1, 2022, and significant management effort was expended in preparing the Company to absorb the conveying employees and in integrating the business. Integration activities, which include preparation for the transition of sample handling and pathogen detection manufacturing into Neogen facilities, progressed during the year. Additionally, the construction of the new production facility in Lansing and implementation of enterprise systems remain on track.

74. Additionally, the 2023 Proxy stated, in relevant part, that:

> Mr. Adent's bonus opportunity for fiscal 2023 was primarily based on the successful closing of the 3M FSD transaction and the preparation for and initial integration of the 3M FSD business, as well as the achievement of the Company's financial objectives . . . .
>
> The fiscal 2023 bonus opportunity for Mr. Jones was primarily based on the successful closing of the 3M FSD transaction and the preparation for and initial integration of the 3M FSD business, as well as the achievement of the Company's financial objectives . . . . Significant efforts were expended to ensure a successful closing of the 3M FSD transaction and Mr. Jones' leadership was instrumental in driving the initial integration of the business . . . .
>
> Dr. Lilly's fiscal 2023 bonus opportunity was primarily based on the successful closing of the 3M FSD transaction and the preparation for and initial integration of the 3M FSD business. . . . Based on his operations' financial performance, and his efforts in the successful integration of both the 3M FSD international business and a recently acquired genomics business, Dr. Lilly was awarded 107% of his bonus opportunity. . . .
>
> Dr. Rocklin's bonus opportunity was primarily based on the successful closing of the 3M FSD transaction and initial integration of the 3M FSD business, as well as the achievement of the Company's financial objectives.

75. The 2023 Proxy also assured investors that the Board maintained adequate internal controls and was overseeing risks to the Company, stating, in relevant part:

> **Board Role in Risk Management**
>
> The Board oversees the Company's risk management. This oversight is administered primarily through the Board's review and approval of the management business plan, including the projected opportunities and challenges facing the business, periodic review by the Board of business developments, strategic plans and implementation, liquidity and financial results, the Board's oversight of succession planning, capital spending and financing, the Audit Committee's oversight of the Company's internal controls over financial reporting and its discussions with management and the independent accountants regarding the quality and adequacy of internal controls and financial reporting (and related reports to the full Board), the Governance Committee's leadership in the evaluation of the Board and committees and its oversight of identified risk areas of the Company, and the Compensation Committee's review and approvals regarding executive officer compensation and its relationship to the Company's business plan, as well as its review of compensation plans generally and the related risks.

October 10, 2023 Statements

76. On October 10, 2023, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2024 (the "1Q24 Press Release"). In the 1Q24 Press Release, Defendant Adent spoke positively on the integration between Neogen and FSD stating, in relevant part:

> ***We made significant progress in the quarter across a number of fronts related to the integration of the former 3M Food Safety division, moving closer to full autonomy of that business within the One Neogen we are building. We have additional key integration activities underway and remain on track for the third-quarter relocation of two product lines and exit of two transition agreements, and the construction of our new facility in Lansing is progressing well***. With our combined commercial and technical teams approaching one year of working together on the product portfolio, we are excited about the momentum that's building and remain as optimistic as ever regarding the future of the business.

77. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of fiscal year 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Adent stated:

> We've made significant progress across a number of fronts on the integration of the former 3M Food Safety business, while continuing to navigate soft market conditions . . . .
>
> On the integration front, the relocation of the former 3M pathogen and sample handling product lines in the Neogen facilities remain on track for completion in the third quarter. Hiring and training of new employees and inventory builds are underway as our initial equipment transfers with site preparation expected to wrap up later this month. These two product lines account for nearly 30% of the revenue of the former 3M business are a strong complement to the Neogen product portfolio that we're looking forward to have fully embedded within our operations. After these moves, we will have nearly 50% of the former 3M product lines fully integrated all but Petrifilm. . . .
>
> The final phase of integration activities involves the construction of our new facility in Lansing, which will house the production of Petrifilm and other products from the legacy Neogen portfolio. The new facility continues to progress on track with construction of the exterior expected to be completed during Q3, at which point the focus will shift to the completion of the interior work and the installation of the custom manufacturing equipment.

> We're pleased with the progress we've made on the integration to date and are focused on the execution of the upcoming key transition activities in the second and third quarters that will bring the former 3M business closer to full autonomy within the One Neogen we're building.

78. During the 1Q24 Earnings Call, Defendant Naemura again highlighted the Company's promising financial performance caused by the Merger, stating, "[a]djusted EBITDA was $52 million, representing growth of 94% from the prior-year quarter, driven by the merger with the former 3M Food Safety division."

79. Additionally, in Defendant Adent's closing remarks on the 1Q24 Earnings Call, he reiterated that integration of the FSD was going well, stating, in relevant part:

> [W]e believe we're making solid progress on the integration of the former 3M business and are on track to be completely independent from 3M in the third quarter outside of Petrifilm manufacturing, but we feel that arrangement is in a stable place . . . .
>
> As we stated earlier, while the quarter was a little softer than anticipated, I think what we wanted to talk about was the success really of the integration . . . .

<u>January 9, 2024 Statements</u>

80. On January 9, 2024, the Company issued a press release announcing its financial results for the second quarter of fiscal year 2024 (the "2Q24 Press Release"). In the 2Q24 Press Release, Defendant Adent spoke on the success of integrating FSD into Neogen, stating, in relevant part:

> ***This is an exciting time on the journey of integrating the former 3M Food Safety business, as we have made notable recent progress and are approaching several additional milestones***[.] We initiated the exit of our transition services agreements, successfully completed the initial phases of the integration of two additional product lines and remain on track to exit all transition agreements outside of Petrifilm manufacturing, where supply has remained stable. . . .
>
> With signs that the most significant external headwinds are stabilizing, we are focused on the value-creation opportunity we believe is ahead of us ***as we make continued progress on the integration*** and positioning the business for long-term

growth.

81. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of fiscal year 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Adent continued to tout the successful integration process of FSD into Neogen stating, in relevant part:

> ***This is an exciting time at Neogen as we're approaching several near-term milestones on the journey of integrating the former 3M Food Safety business***. Following the launch of our new ERP system in September, ***we made further progress by initiating the exit of several transition service agreements that we have with 3M, while continuing to ramp up our internal capabilities. On the manufacturing front, we also successfully completed the first phase of the relocation of the former 3M pathogen and sample handling product lines into Neogen facilities***. The final relocation of the sample handling production we now expect to complete in Q4, ***but otherwise remain on track to exit all transition agreements outside of Petrifilm manufacturing by the end of the third quarter***.

<u>April 9, 2024 Statements</u>

82. On April 9, 2024, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2024 (the "3Q24 Press Release"). Defendant Adent spoke on a "milestone" in the integration of FSD into Neogen, stating, in relevant part:

> ***The third quarter saw us complete a number of milestone achievements related to the integration of the former 3M Food Safety business***[.] We completed the relocation of the pathogen detection product line and the initial phases of the relocation of the sample handling product line, which we expect to complete in the fourth quarter. We also completed the exit of the transition service agreements covering back-office functions and distribution. Petrifilm manufacturing will ultimately transition into our new production facility in Lansing, the construction and outfitting of which remains on track. . . .
>
> The progress we've made on integration, particularly as it relates to the exit of the transition distribution agreement and the resulting increase in volumes in our primary distribution facility, has created operational inefficiencies that we continue to manage through. ***We believe these inefficiencies are temporary***. . . .

83. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of fiscal year 2024 (the "3Q24 Earnings Call").

During the 3Q24 Earnings Call, Defendant Adent again touted Neogen's integration progress, stating, in relevant part:

> We completed the relocation of the former 3M pathogen detection product line and are now manufacturing in one of our Lansing facilities.
>
> We also completed the first-two of our four phase relocation of a former 3M sample handling product line to one of our facilities in Lexington. With the remaining two phases expected to be completed by the end of the fiscal year and production beginning in Q1.

84. During the 3Q24 Earnings Call, Defendant Adent also discussed the "inefficiencies" that the Company was experiencing during the integration of FSD. However, Adent assured investors that these inefficiencies were temporary and being addressed by management, stating, "[W]e have our arms around the key issues and are fully committed to resolving them in the future . . . . The integration process we've made has also come a substantial investment in working capital or CapEx this year, which we expect will reduce significantly in 2025."

<u>July 30, 2024 Statements</u>

85. On July 30, 2024, the Company issued a press release announcing its financial results for the fourth quarter of fiscal year 2024 (the "4Q24 Press Release"). In the 4Q24 Press Release, Defendant Adent was quoted as stating, in relevant part, that:

> After crossing multiple significant integration milestones in the third quarter related to the integration of the former 3M Food Safety business, progress continued on multiple fronts in the fourth quarter[.] We completed the relocation of the sample handling product line, which we expect to have running at full production by the end of the first quarter. We also saw improvement in our order fulfillment rates throughout the quarter, which have subsequently improved to the point where they are no longer a constraint.

86. The same 4Q24 Press Release also provided the outlooks for Neogen's fiscal year 2025, reporting that:

> Revenue is expected to be $925 million to $955 million, reflecting core revenue growth in the mid-single-digit range, offset primarily by an anticipated foreign currency headwind. Adjusted EBITDA is expected to be $215 million to $235 million, while capital expenditures are expected to be approximately $85 million, including approximately $55 million related specifically to the integration of the former 3M Food Safety Division.

87. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for fiscal year 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Adent stated, in relevant part:

> ***After crossing multiple significant integration milestones in the third quarter, progress continued on multiple fronts in the fourth quarter***. We finished relocating the former 3M sample handling product lines in our facility in Lexington, Kentucky and are now in the process of ramping up to full production levels, which we expect to be at the end of next month. We also saw improvement throughout the fourth quarter in our shipping performance and this progress has allowed our commercial teams to return their focus to what they do best, demand generation.

88. During the 4Q24 Earnings Call, Defendant Naemura spoke on capital expenditures of the Company, stating, in relevant part, that "[w]ith respect to capital expenditures, we are anticipating a sizable decrease as we move past the peak integration spend of fiscal '24. For fiscal '25, we expect capital expenditures of approximately $85 million with approximately $55 million, specifically related to integration items."

89. Moreover, during the same 4Q24 Earnings Call, Defendant Adent reassured investors that the integration of FSD was on track and that any inefficiencies resulting from the Merger had been resolved, stating:

> ***The last couple of quarters have seen a tremendous amount of integration progress*** as we extricated ourselves from the services previously provided by our transition partner. ***This progress came with the inefficiencies in our distribution center that we discussed and have now resolved***. Fiscal 2024 represented the peak of cash outflows for the integration, in terms of both capital expenditures and working capital investment. ***Outside of the new facility we're building, the 3M food safety operations have now been combined with Neogen and we're able to shift a significant portion of our operational focus towards driving improvements in these combined operations***.

September 13, 2024 Statement

90. On September 13, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). In the 2024 Proxy assured investors that the Board maintained adequate internal controls and was overseeing risks to the Company, stating, in relevant part:

> **Board Role in Risk Management**
>
> The Board oversees the Company's risk management. This oversight is administered primarily through the Board's review and approval of the management business plan. This includes the projected opportunities and challenges facing the business, periodic review by the Board of business developments, strategic plans and implementation, liquidity and financial results, the Board's oversight of succession planning, capital spending and financing. Committee review includes the Audit Committee's oversight of the Company's internal controls over financial reporting and its discussions with management and the independent accountants regarding the quality and adequacy of internal controls and financial reporting (and related reports to the full Board), the Governance Committee's leadership in the evaluation of the Board and committees and its oversight of identified risk areas of the Company, and the Compensation Committee's review and approvals regarding executive officer compensation and its relationship to the Company's business plan, as well as its review of compensation plans generally and the related risks.

October 10, 2024 Statement

91. On October 10, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of fiscal year 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Adent told investors that the Company had made "huge strides in 2024" in its integration of FSD. Defendant Adent also assured investors that Neogen was moving past the issues relating to integrating FSD, stating, in relevant part:

> I think that's what gives me a lot of excitement is we spent a lot of time and energy in the last two years of working on integration to carve the business out and bring it into ours. ***And now what we're starting -- significant teams in Neogen are starting to refocus that energy and time from integration efforts to efficiency and growth efforts, which is what I'm really excited to see the team do***.

92. The above statements in ¶¶ 64–91 were materially false and/or misleading and

failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's integration of 3M's FSD into its business was riddled with inefficiencies from day one, the Company's executives and directors knew these integration issues would necessitate a goodwill impairment, and these integration issues would impact the Company's financial health, including its capital expenditures, revenues, and EBITDA margins; (ii) due to the size of the Merger, the Company was experiencing issues integrating 3M's FSD into its business with respect to manufacturing, shipping, production overlap, and internal controls; (iii) there was no reasonable basis to believe that Neogen's capital expenditures would lessen significantly in 2025; (iv) the Company failed to maintain adequate internal controls over the integration and its public reporting, among other things; and (v) as a result of the foregoing, positive statements concerning the Company's business, financials, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

93. The truth began to emerge on January 10, 2025, when the Company issued its Preliminary 2Q25 Press Release announcing its preliminary financial results for the second quarter of fiscal year 2025. In the Preliminary 2Q25 Press Release, the Company revealed disappointing financial results, reporting that the Company experienced a net loss of $456.3 million for the third quarter, or $2.10 per share (compared to a net loss of $3.5 million, or $0.02 per share the same quarter the prior year), which was "driven by a non-cash goodwill impairment charge related primarily to the acquisition of the former 3M Food Safety Division."

94. In the 2Q25 Preliminary Press Release, the Company also announced that it was adjusting its fiscal year 2025 outlook, decreasing its revenue to be in the range of $905 million to

$925 million and its Adjusted EBITDA to be in the range of $205 million to $215 million. Additionally, in the Preliminary 2Q25 Press Release, the Company admitted that "[a]s a result of management's assessment of the Company's internal control over financial reporting, the Company concluded that, as of November 30, 2024, the Company had deficiencies in the control activities and information . . . that constitute material weaknesses."

95. On this news, the price of Neogen stock declined by approximately 5%, from a price of $13.07 per share on January 8, 2025, to a price of $12.36 per share on January 10, 2025.

96. The truth continued to emerge on April 9, 2025, when the Company issued its 3Q25 Press Release announcing its financial results for the third quarter of fiscal year 2025. In the 3Q25 Press Release, the Company reported a loss of $11 million for the third quarter, or $0.05 per share (compared with a loss of $2 million, or $0.01 per share, the same quarter in 2024). In the 3Q25 Earnings Release, the Company also reported that its revenue fell 3.4% to $221 million during the quarter and that it was again cutting its revenue outlook for fiscal year 2025 to approximately $895 million. The Company also noted in the 3Q25 Press Release that capital expenditures were expected to be $100 million as a result of lowered adjusted EBITDA and a "pull-forward of integration capex into fiscal 2025."

97. Following this news, in a separate press release on April 9, 2025, Neogen announced that Defendant Adent would be stepping down from his roles as director, CEO, and President of Neogen after an eight-year career at the Company.

98. On this news, the price of Neogen's stock declined by approximately 28%, from a price of $7.04 per share on April 8, 2025, to a price of $5.02 per share on April 9, 2025.

***The Truth Fully Emerges***

99. The truth was fully revealed on June 4, 2025, when the Company published

presentation materials for the William Blair Growth Stock Conference, which, in Neogen's update for the fourth quarter of fiscal year 2025, revealed that the Company's "[a]djusted EBITDA margin anticipated to be in the high-teens range" which represented a considerable drop from the previous quarter's profit margin of 22%. Neogen blamed the expected shortfall on "elevated inventory write-offs."

100. On this news, the price of Neogen's stock declined by approximately 17% from a price of $6.00 per share on June 3, 2025, to a price of $4.96 per share on June 4, 2025.

***Harm to the Company***

101. As a result of the misconduct detailed herein, the Securities Class Action was filed against the Company, Defendant Adent, and Defendant Nameura in the United States District Court for the Western District of Michigan on July 18, 2025.

102. As a direct and proximate result of the Individual Defendants' misconduct, Neogen has lost and expended, and will lose and expend, millions of dollars.

103. Such expenditures include, but are not limited to, (i) the legal fees associated with the Securities Class Action filed against the Company and Defendants Adent and Nameura, and amounts paid to outside lawyers, accountants, and investigators in connection therewith; (ii) significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties; (iii) costs of remediating deficiencies in the Company's internal controls; (iv) reputational harm to, and mistrust in, the Company as a result of the misrepresentations mentioned above; and (v) lost business opportunities.

104. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

105. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

106. Neogen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

107. Plaintiff is a current shareholder of Neogen and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

108. At the time this action was commenced, the ten-member Board was comprised of Defendants Borel, Bernard, Capello, Green, Gupta, Rodriguez, and Woteki, as well as non-parties Andrea Wainer, Mike Nassif, and Avi Pelossof.

109. The Individual Defendants either knew, or should have known, of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

110. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders, or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

111. Additionally, the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

112. Moreover, the Individual Defendants willfully ignored, or recklessly failed to

inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

113. Nevertheless, by letter dated August 13, 2025, Plaintiff made a demand on the Board to investigate and remedy the violations of law described therein (the "Litigation Demand"). *See* Exhibit A.

114. In the Litigation Demand, Plaintiff demanded as follows:

> Stockholder hereby demands that the Board take "suitable action" pursuant to Mich. Comp. Laws § 450.1493a. Specifically, Stockholder demands that the Board initiate and complete an investigation into breaches of fiduciary duties, and violations of all other federal and state laws, regulations, and rules, including but not limited to, violations of federal securities laws, by members of the Board and Neogen's executives with respect to the false and misleading statements made regarding, *inter alia*, the Company's integration of 3M's FSD into Neogen's business and the Company's financial status and prospects. Such investigation must cover not only the facts cited herein but any other credible indication of misconduct by Neogen's executives and Board members concerning false and misleading statements made during the Relevant Period. The Board must undertake an investigation of the wrongdoing detailed herein by independent and disinterested directors with the assistance of independent outside legal counsel. The investigation should be sufficient to determine:
>
> (a) which current or former Neogen employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's failure to comply with applicable laws and regulations;
>
> (b) which current or former Neogen employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in the Company's false and misleading statements, including those made through SEC filings and in the Company's quarterly earnings calls;
>
> (c) which current or former Neogen employees, officers, directors, and/or agents were responsible for, had knowledge of, and/or played an active role in oversight of all of the forgoing;
>
> (d) the extent to which the current or former Neogen employees, officers, directors, and/or agents benefited as a result of the breaches of fiduciary duty owed to the Company and its stockholders; and

> (e) the extent to which Neogen was damaged by all of the foregoing.
>
> Following the investigation, Stockholder demands that the Company commence legal proceedings against each party identified as being responsible for the misconduct identified by the independent investigation. The legal proceedings should bring claims for breaches of fiduciary duty, among other relevant and appropriate state and federal claims. The legal proceedings should also seek recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation.
>
> The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. The Board should secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies. To the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire.

115. Plaintiff also demanded in the Litigation Demand that Individual Defendants take steps to reform and improve corporate governance and internal procedures, stating:

> [I]n addition to recovering out-of-pocket funds Neogen expended in connection with this matter, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Neogen from committing future wrongful and wasteful acts. Moreover, any future resolutions to the Company's Articles of Incorporation or Bylaws should be put to a stockholder vote, and the following actions may be necessary to ensure proper corporate governance policies, among others:
>
> (a) a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
>
> (b) a proposal to strengthen the Company's disclosure controls; and
>
> (c) a provision to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board.

116. The Litigation Demand outlined the alleged misstatements issued by the Individual Defendants related to the Merger and integration of FSD.

117. Under Michigan law, "[a] shareholder may not commence a derivative proceeding

until all of the following have occurred: (a) [a] written demand has been made upon the corporation to take suitable action," and "(b) [n]inety days have expired from the date the demand was made. . . ." Mich. Comp. Laws § 450.1493a (1989).

118. On November 12, 2025, ninety-one days after Plaintiff sent the Litigation Demand, counsel for Neogen sent a letter in response, stating "I am writing to acknowledge your letter to the Board of Directors of Neogen Corporation . . . Please be advised that the Board has established a committee which is considering your letter and will provide a response." *See* Exhibit B.

119. Plaintiff has received no further communications from Neogen regarding the Litigation Demand.

120. More than ninety days have elapsed from the date on which Plaintiff's demand was made, and the Board has not taken the action demanded in the Litigation Demand. This failure to respond constitutes a wrongful refusal of the Litigation Demand, is unreasonable and improper, and demonstrates the Board's lack of good faith.

121. Accordingly, refusal of the Litigation Demand is not a valid exercise of business judgment. Because more than ninety days have expired from the date that the written demands in the Litigation Demand were made upon the Board, Plaintiff is permitted to proceed and to prosecute this action derivatively on behalf of the Company pursuant to Mich. Comp. Laws § 450.1493a (1989).

**COUNT I**
**Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

122. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C.

§ 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

124. Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781].

15 U.S.C. § 78n(a).

125. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

126. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy and 2024 Proxy (collectively, the "Proxy Statements"), which were filed with the SEC. As alleged above, the Proxy Statements contained materially false and misleading statements concerning, among other things: the integration of FSD into Neogen, the justification for bonus opportunities for certain Individual Defendants, and the adequacy of internal controls to oversee risks to the Company.

127. The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Individual Defendants.

128. The materially false and misleading statements contained in the 2023 Proxy improperly induced shareholders to vote for the reelection of Defendants Gupta, Rodriguez, and Woteki to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

129. The materially false and misleading statements contained in the 2024 Proxy improperly induced shareholders to vote for the reelection of Defendants Borel, Capello, and Green to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

130. The Company was damages as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

131. Plaintiff, on behalf of Neogen, has no adequate remedy at law.

## COUNT II
## Against the Individual Defendants
## For Breach of Fiduciary Duty

132. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

134. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

135. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and

procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

136. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's integration of 3M's FSD into its business was riddled with inefficiencies from day one, the Company's executives and directors knew these integration issues would necessitate a goodwill impairment, and these integration issues would impact the Company's financial health, including its capital expenditures, revenues, and EBITDA margins; (ii) due to the size of the Merger, the Company was experiencing issues integrating 3M's FSD into its business with respect to manufacturing, shipping, production overlap, and internal controls; (iii) there was no reasonable basis to believe that Neogen's capital expenditures would lessen significantly in 2025; (iv) the Company failed to maintain adequate internal controls over the integration and its public reporting, among other things; and (v) as a result of the foregoing, positive statements concerning the Company's business, financials, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

137. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that the internal controls were not adequately maintained, or they acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even

though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

138. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

139. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

140. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, lost business opportunities, and reputational harm.

141. Plaintiff, on behalf of Neogen, has no adequate remedy at law.

## COUNT III
## Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

142. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual

Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

144. Plaintiff, on behalf of Neogen, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Unjust Enrichment**

145. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Neogen.

147. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Neogen that was tied to the performance or artificially inflated valuation of Neogen, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

148. Plaintiff, as a shareholder and representative of Neogen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

149. Plaintiff, on behalf of Neogen, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

150. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151. The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

152. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

153. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

154. Plaintiff, on behalf of Neogen, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing Neogen to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Neogen and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with

applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions.

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: December 4, 2025

**FINK BRESSACK**

By: */s/ David H. Fink*
David H. Fink (P28235)
Nathan J. Fink (P75185)
38500 Woodward Avenue, Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
Email: dfink@finkbressack.com
Email: nfink@finkbressack.com

*Attorneys for Plaintiff*

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky (admission application to be submitted)
Vincent A. Licata (admission application to be submitted)
Leah B. Wihtelin (admission application to be submitted)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com

Email: vl@rl-legal.com
Email: lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar (admission application to be submitted)
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

# VERIFICATION

I, James L. Topper, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Neogen Corporation common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 12/4/2025

Signed by:
James Topper
252FFE7EC5C6411...

JAMES L. TOPPER